Mr. Chief Justice, and may it please the Court, Chapter 11 provides one way to distribute estate assets to creditors on account of their pre-petition claims, through a confirmed plan that adheres to the Code's priority scheme. If a Chapter 11 plan can't be confirmed, the Bankruptcy Court can convert the case to Chapter 11. The Bankruptcy Court can also dismiss the case without distributing assets to creditors at all, returning all parties to their pre-bankruptcy position. No provision of the Bankruptcy Code permits what happened here, an order dismissing a Chapter 11 case that distributed all the estate's assets to creditors but deliberately skipped over our client's priority claims. Sotomayor, did the settlement bar you from suing the debtor for the Warmack claims? No, it did not. And there was no money left to the debtor, so did it bar you from suing Sun Life for a fraudulent transfer? It did. It did. It did, Justice Sotomayor, and I think that's critical. What this settlement did is it took away our client's right to pursue either the debtor or Sun and CIT on account of their undisputed Warnack claims, which were in the area of $12 million. All right. Are you in the court below, I understand, that you represented that if this settlement went through, that you would have — I'm sorry, that without the settlement, you would really have nothing because there was no money in the estate. So are you representing that your client intends to sue Sun Life? Because that's the only way to get money here. Well, let me — let me respond to that, Justice Sotomayor. There are a few things that could happen if this Court reverses the order below and the case is remanded. That's fine. Tell me which one you're going to do. Well, that's really up to the bankruptcy court. All right. So what do you — are you going to ask them to do? What we had asked for before, and what may well make the most sense, is conversion to Chapter 7, in which case either the Chapter 7 trustee could pursue the fraudulent transfer claim. But there's no money in the estate to do that. So how will the trustee do that? The trustee would have to retain contingency counsel. And that does happen. I was involved in a Chapter 7 case where the trustee pursued an avoidance action successfully with contingency counsel. Failing that, if the trustee decided not to do that, after the bankruptcy is over, the fraudulent transfer claim would revest in the creditors, and our clients could then bring that claim themselves. There's a difference. There seems to be a difference between what you have said on this point in your briefs and in your argument this morning and what you told the Third Circuit. Did your firm represent a peer in the Third Circuit? Not until the rehearing stage. Well, in the Third Circuit oral argument, it was said over and over, well, we just want to make sure that the law is followed. That's what we're interested in. Isn't that right? We certainly do want to make sure that the law is followed. I mean, we — But you were pressed as to what practical difference the case meant to you. And the answer was, you know, we want to uphold the law. Justice Alito, I don't believe that's the case. The case does make a practical difference. It always has made a practical difference. That's the only reason our clients have been pursuing it. And the practical difference it makes is that on remand, they will have an opportunity to recover on account of their undisputed Warren Act claims, which, as of now, they've been deprived of. But can you point to anything you said in the Third Circuit in writing or orally along those lines, that there was some practical course of action that you — some tangible thing that you were going to pursue? What we told the Third Circuit is that if this case went back on remand and were converted to Chapter 7, then the fraudulent transfer action could be pursued. I believe that's what — that's the argument that we made below. Can I ask you one other — one other thing? Something strange seems to have happened between the petition stage and the briefing stage in the case. The question that you asked us to take was whether a bankruptcy court may authorize the distribution of settlement proceeds in a manner that violates the statutory priority scheme. And you said there's a square conflict on that issue with the Second Circuit and the Third Circuit on one side and the Fifth Circuit on the other side. Correct. And we took the case. But then the question that you address in your brief refers to structured dismissal. There's nothing about structured dismissal in the question that you asked us to take. And there is no conflict on the question of structured dismissal, is there? And, Justice Alito, we're not asking this Court to decide the question of whether structured dismissals are valid. We did not change the substance of the question. No, you're not asking us to decide the broad question whether there can ever be a structured dismissal. But you are asking us to decide whether the priorities have to be followed in a structural dismissal. And unless the answer to that question follows from the answer to the question that you presented in your petition, you have changed the question that you have asked us to decide. We did not change the substance of the question presented. In the petition, we had a paragraph of background explaining that this was done through a structured dismissal. We then asked the question, does the bankruptcy code, may a bankruptcy court authorize the distribution of settlement proceeds in a manner that violates the code's priority scheme? In the brief, we condensed that a bit so that we didn't have the paragraph of background, and we said, may a structured dismissal distribute estate assets in violation of the priority scheme? There's no substantive difference there. The authorization in this case was done through a structured dismissal. Settlement proceeds are estate assets. The basic question in this case has always been the same. Was the bankruptcy court entitled under the bankruptcy code to authorize this distribution of settlement proceeds, which are estate assets, in violation of priority? Breyer. Exactly. So what forbids it? You started out by saying there is nothing in the code that permits this kind of settlement, which, in fact, leaves out, gives some money to lower-ranking creditors without giving them to your client. I think you're right. I don't see anything that permits it. The problem, what forbids it?  The structure of the code forbids it. The structure and the text of the code. If we take a step back for a moment, the way business bankruptcies work is that the debtor files a petition. That creates an estate, which includes all the debtor's property, and it also includes causes of action belonging to the estate. That estate is then held in trust, essentially, for the benefit of creditors. It is protected against creditors' claims through the automatic stay. The trustee or debtor in possession can dispose of estate assets only in accordance with strict limitations and subject to the bankruptcy court supervision, and at the end of the case, those assets are distributed to creditors through a confirmed Chapter 11 plan, which requires adherence to priority. Or failing that, the case can be converted to Chapter 7, in which case the assets are also distributed in accordance with priority. Those careful, reticulated mechanisms for the distribution of estate assets foreclose any inference that Congress intended to allow courts to disregard them and create a different method for distributing assets that's not mentioned anywhere in the code that violates that backbone priority scheme. Kagan. Why do you think, though, it isn't mentioned someplace in the code? I mean, did Congress just not think that this might happen? No, Justice Kagan. I think the reason that Chapter 11 doesn't expressly apply the priority rules to settlements is that settlements are not intended to be a method of distributing estate assets. I think it's very important to keep those two things distinct. On the one hand, we have a settlement of a cause of action belonging to the estate. The estate relinquishes its rights in return for money, and money goes into the estate. That is one thing. Separately, there is a distribution of all of the assets in the estate, including the proceeds of the settlement. And that is done in Chapter 11 through a Chapter 11 plan. So Congress would not have specified that priority applies to settlements because settlements are not a means for distribution of estate assets. Only the plan does that. Ginsburg. It can be a dismissal. There are three things. Two are covered, Chapter 7 and Chapter 11, but this is a dismissal, which means, as I understand it, you return to the preexisting situation. That's correct. But now you're saying there are assets and the Court has to do something about the distribution of those. Correct, Justice Ginsburg. There are two methods for distributing estate assets contemplated by the corporate provisions of the Bankruptcy Code, either a Chapter 11 plan or the Chapter 7 distribution set out in Section 726, both of which require adherence to priority. A case can also be dismissed. In that case, there is no distribution of estate assets at all. That's not contemplated in conjunction with a dismissal. Rather, the parties are returned to their pre-bankruptcy positions. But the Code does say 349 unless the Court forecalls orders otherwise. Can you tell us how that is — what was the likely purpose for that? Justice Kennedy, what the — From a very literal standpoint, it does cover what the Respondent's position is here. Why is it inapplicable and why is — does it fall in face of the overall description that you just gave to Justice Ginsburg? Justice Kennedy, what the legislative history tells us is that the forecalls provision in Section 349b was intended to protect parties who took actions in reliance on the bankruptcy. And I think it's important to look at — Can you give me an example? I can. So one case that's cited in our briefs is In re Weis, which is a Seventh Circuit case. In that case, there was a plan that had been confirmed that in which the debtors released their claim against the bank that had lent them money in return for the banks releasing its lien on some cash that they had. And that cash was then dispersed and couldn't be gotten back. The debtors then dismissed their case shortly after the plan was confirmed, and the Seventh Circuit said this was an appropriate case in which to use the forecalls provision. Typically, the release that occurred in the plan would be undone. But in order to avoid unfairness to the bank, which had taken action in reliance on the plan, the Court was not going to do that. Instead, it was going to hold the debtors to their release. Kennedy, if fairness is the basis for the forecalls order, the Respondent will say, well, this is fair because most creditors were paid, so you can hear the arguments. We just talk about fairness. That's different from the careful answer you gave to Justice Ginsburg about the priority scheme. Yes, Justice Kennedy, Section 349B doesn't create that kind of gaping hole in the scheme I just described. It's important to understand what it actually does. I think it's a relatively limited provision. So Section 349 says that the default, when a bankruptcy case is dismissed, is that certain transactions that occurred during the case, such as avoidance actions, get unwound, liens that have been voided are reinstated, and property remaining in the estate is returned to its pre-bankruptcy owner. In other words, the bankruptcy is undone as far as possible. The cause exception is an exception to that. So what the cause exception permits a bankruptcy court to do is to maintain the status quo at the time of dismissal when there is good reason to do so, and the typical good reason would be reliance by a party on something that happened during the bankruptcy case. But Section 349B doesn't then permit the court to go beyond that and do something that's not contemplated in conjunction with a dismissal at all, that doesn't involve maintaining the status quo, but involves actually distributing assets to creditors in violation of the priority scheme. Roberts. You said that that reading was supported in the legislative history, if I understood you correctly. What is the nature of that legislative history? The legislative history essentially — there's not a lot of it, but what it essentially says is the bankruptcy courts should use that provision, the cause provision. No, no. Where is that? In the Senate report or what? I apologize, Your Honor. I believe we cited it in our brief, and I believe it is in the House, the 1977 House report. Thank you. May I ask, Mr. Maloney, just quickly, what's the scope of the holding that you would like us to issue? I suppose this comes back to Justice Alito's question of what's actually on the table. All settlements, all structured dismissals, just this particular kind, and if just this particular kind, how would you characterize it? What we think this Court should hold is that settlement proceeds cannot be distributed in violation of priority. So a settlement that is — that distributes proceeds. Correct. To be more specific, the order that was entered here, we believe, could never be lawful regardless of the stage of the case at which it was entered. So we're not saying this order would only — this order is only unlawful because it was part of a structured dismissal. We're saying it's unlawful because it took estate assets and distributed them in violation of priority. You're saying that there can never be a distribution of estate assets except in compliance with the priorities? No. There is one — I thought that's what you — that's not what you just said. That — well, let me — let me qualify what I just said, then. There is one express exception in the code that Section 510 provides that claims can be subordinated to other claims under the principles of equitable subordination, which, as this Court said in Noland, are limited to a creditor's bad behavior that harms the estate. There are also some practices that occur in bankruptcy court that — whose validity I don't think this Court needs to reach. For instance, critical vendor orders are an example. Courts will sometimes permit, on the first day of a case, a debtor to pay certain vendors on account of their prepetition claims because doing so is necessary to the debtor's maintaining a going concern and reorganizing and coming out the other end a viable business. That's based on a doctrine that goes back many, many years before the bankruptcy code called the doctrine of necessity. And the reasoning behind that is because a going concern is worth so much more than the debtor's assets liquidated piecemeal, that creates the possibility of a greater recovery for creditors higher up the priority chain. What happened here is precisely the opposite. There was no possibility of reorganization. This was a naked priority violation for its own sake. And whatever one thinks about critical vendor orders, what happened here, taking value from senior creditors and giving it to junior creditors for its own sake is not permitted. May I reserve? Thank you. Roberts. Thank you, counsel. Ms. Harrington. Thank you, Mr. Chief Justice, and may it please the Court. I'd like to start, if I could, with Justice Kagan's last question, which is what would we like the Court to hold in this case? We think the Court should hold that a bankruptcy court can never resolve a bankruptcy by ordering the distribution of the State assets in a manner that violates the code's detailed priority system without the consent of the impaired priority claim holder. You don't even have the extraordinary circumstances exception? No. We don't. I mean, basically, the extraordinary circumstances exception that the Third Circuit wanted to apply would bring in any case that is administratively insolvent, and that's a large proportion of business bankruptcies. That kind of exception also gives parties the wrong incentive to make essentially self-serving assertions about what they would or would not do if the particular disposition that they desire not be fulfilled. You presumably qualify that with the statutory provision that was just mentioned, and my guess was you want to qualify that as well with the emergency creditor, you know, where you're going to sink the person who has a prepetition. It was just discussed. Well, the prepetition distributions that were just discussed, I think that does present a separate question. We think that's all I wanted to know. You don't want a holding here that is going to knock that out. Right. So I said that a court cannot resolve a case by ordering the distribution of assets that would violate the priority scheme. Now, in our view, the priority scheme is sort of a broad term that includes both equitable subordination principles, which are not applicable here, and also includes the ability of the priority claim holder to consent to impairment of its rights. I think it's important to keep in mind here that the priority claim holders here, Petitioners, did not settle. This is not a case where the people whose rights were impaired agreed to it, and you can't have you can't call a settlement basically the agreement of other parties whose rights were not impaired and who in fact benefited from the impairment of the Petitioner's rights. Alito, what would be your principled basis for distinguishing the exception that Ms. Spinelli outlined at the end of her argument from what happened here? I thought your argument was that the priority scheme applies to everything that happens in a Chapter 7 and a Chapter 11. Spinelli. Yes. So in our view, pre-petition distributions in Chapter 11 that violate the priority scheme are not permissible under any circumstances unless there is consent of the impaired priority claim holder. And so critical vendor orders, if they are done over the objection of the claim holder who skipped, we think those are not permissible. Now, most of the times, those sort of first order distributions happen in a plan of reorganization, not in a plan of liquidation, in a case of reorganization, not a liquidation case. They happen with the consent of the senior claim holders, and they are generally premised on a prediction that allowing that kind of distribution will ultimately result in every creditor getting more money at the end of the day. So none of those factors apply here. You didn't have consent. This is not an ongoing concern, and there's certainly no finding that everybody is going to get more money at the end of the day. Alito, if I could just add one more thing. There's another logically prior question, and I don't know, what do you think we should do with the question of whether the bankruptcy court has to approve settlements at all? Because there's nothing in the code that says that they have to. So we think that a bankruptcy court does have to approve a settlement that disposes of a claim held by the estate or asserted against the estate. We don't think this Court needs to reach that question in this case if it doesn't want to, because we think it's very clear that what a settlement cannot do is provide for the distribution of estate assets. I think it's important to keep in mind that estate assets don't belong to the debtor and they don't belong to a subset of creditors. They belong to the estate. And so the code provides only specific ways that those assets can be distributed. In Chapter 11, that's through a plan. Kagan. Keisler. Just to make sure I understand the scope of what you're saying, we should decide. Would that also knock out the thing that was approved in Iridium itself? Yes. We think it would. If you limit your holding to the resolution of a case, then it would not because Iridium did not involve the resolution of the case. We think the principle applies more broadly to pre-petition distributions as well when you don't have consent. But if the court prefers not to, it doesn't need to reach that question in this case. So you don't agree completely with Judge Sirica's dissent? We don't. I would point out, again, that he's a dissenter in that case. And so even he didn't think that this case would qualify. But we don't think there's anything in the code that would allow parties to override the priority claimholder's assertion of their rights. Now, it's important to keep in mind that Chapter 11 is very flexible. It allows basically any type of plan to be confirmed if all the parties can agree on the terms of the plan. That was an innovation in Chapter 11 in 1978. It didn't exist in the Bankruptcy Act. And I think that sort of clearly expresses Congress's intent that parties, if they can come to an agreement that deviates from sort of the usual course, then they should do it, and that agreement should be memorialized in a plan, not in some other disposition. Kennedy, just as a matter of practice and experience, do priority creditors in settlement, structured settlement agreements, often allow junior creditors to receive something? Well, they often do in plans. In our experience, when there's a structured dismissal, like the kind at issue here, usually those, the parties turn to that kind of disposition because they can't obtain the consent of the parties that they would need to get a plan confirmed. And so basically what you have is an agreement that is in essence an unconfirmable plan, and instead of trying to get that confirmed, they call it a structured dismissal to override the consent of the priority claimholders. And so in those cases, no. But I think priority claimholders all the time agree to an impairment of their rights. And in fact, the priority claimholders, other than Petitioners who were paid in this case, agreed to take, you know, some cents on the dollar, like the tax claimholders and those administrative expenses. Sotomayor's do you believe that the question presented here did not address the issue before us? Do you see a difference between the question presented that talked about the absolute priority rule as it relates to settlement proceeds and the structured dismissal here? I don't think so. I think the change in wording was meant to sort of give the particular context that the question arises in this case. And if any, if there's any difference, it's just a narrower sort of set of what the law says. Sotomayor's Well, it goes to a more fundamental question, which is, is there a difference in our ruling whether we say no settlement proceeds can be distributed in violation of the absolute priority rule from a statement that no dismissal, structured dismissal, can be entered in violation of the absolute priority rule? I do think there's a difference. Well, I think your first formulation is a little bit broader than the second formulation. And like I said, we think the rule would apply also to pre-planned dispositions of estate assets. If you wanted to limit your holding just to sort of the resolution of a case in a way that is kind of a substitute for a plan, then I think you could just say a structured dismissal can't authorize the distribution of estate assets. But I'd like to, again, sort of distinguish the settlement of the claim from the distribution of estate assets. The two things were put together in this case, and they're put together throughout Respondent's brief, but they're really separate things. There's nothing in the code that would authorize a debtor or some subset of creditors to distribute estate assets. They don't have any say in how estate assets are redistributed. The code and Congress have a say in that. Ginsburg, how can you have a settlement if it can't be carried out? I mean, you're saying one thing is the settlement and that's okay, and the other thing is the distribution of the assets, but that's what the settlement provides for. Well, what the settlement should provide for is basically a liquidation of a claim. And so if you have a claim by the estate against a third party, here a creditor, you basically reduce that claim to a dollar amount, and those dollars become property of the estate. If you have a settlement of a claim that's asserted by a creditor against the estate, then it's the same kind of thing. You sort of liquidate the claim. You reduce it to a dollar amount, and that becomes the claim against the estate held by the creditor. But nothing in the code would authorize, and I think it would be a violation of the priority system, and generally of the system that distributes estate assets, to have parties agree on the side of how estate assets should be distributed. Those estate assets are not the property of the debtor once the bankruptcy starts. They're not the property of the creditors. And so you really need to look to the code provisions to see how the estate assets should be distributed. In a chapter go ahead. Alito, what is your response to the argument that your argument regarding Section 103a makes the provisions that specifically make the priorities applicable in Chapter 7 and Chapter 11 superfluous? Well, it doesn't, because if you look at those provisions, and one of them is Section 1129a9, and then it's Section, I think, 726 in Chapter 7, they don't just say Section 507 priority scheme applies. They also specify exceptions, and they specify the manner in which it applies. And so in Section 1129a9, it says priority claim holders can agree to an impairment of their rights. That exception is not included in Section 7, in the Chapter 7 analog. It also says, tells you what it means to pay a priority claim holder either through deferred cash payments, depending on the type of 507 claim, the parties have a right to demand one or the other. And so there's more to it than just saying, oh, Section 507 applies. It tells you how it applies and in what circumstances. So those are just exception provisions? Exception, but it also sort of tells you what it means to fully, in the Chapter 11 context, it tells you what it means to pay a priority claim holder. And so some priority claim holders, like I said, can demand cash on the date of confirmation. Others have to agree, in some circumstances, to deferred cash payments. And so there's definitely more content to it. In the Chapter 7 context, it also tells you which type of 507 claims are allowed based on when the associated proof of claim was filed. So there's, in both cases, they kind of, they add more substance than the Respondents would have you believe. I'd just like to point out that Congress enacted the priority scheme precisely to prohibit the kind of collusive-looking agreements that happened here, where you have high-priority and low-priority creditors kind of squeezing out the middle creditors. And the Court should not allow parties to make an end run around that prohibition by just slapping the name settlement or structured dismissal on what is really, in essence, an unconfirmable plan. We think that's what happened here. The parties, some of the parties reached an agreement. The agreement couldn't be confirmed as a plan because it abrogated the rights of priority claim holders, and they did not consent. Thank you, counsel. Thank you. Mr. Landau. Thank you, Mr. Chief Justice, and may it please the Court. Petitioners say that the bankruptcy court here was required to reject a settlement that made all other unsecured creditors better off without making Petitioners any worse off. Nothing in the code requires that result. The absolute priority rule, and this is critical, applies in Chapter 11 only to plans You took away a legal right from them. Well, Your Honor. They had a legal right to sue Sun Life. They had a legal right to pursue their other claims, and the settlement extinguished those rights. And I think the question, the critical question here is are we in a place where the disposition of estate assets was required to comply with the absolute priority rule? This is the absolute gist of the case. By its terms, I think this goes back to a question that Justice Kagan asked earlier, the code speaks to when the absolute priority rule applies in Chapter 11, and it applies to plans. Whenever you have dispositions of assets before plans, they are subject to judicial review. The use, sale, or lease of assets is subject to judicial review under Section 363b, but that is a discretionary standard. Now, in applying the discretionary standard, it's absolutely critical to make sure that there is no evasion of requirements for a plan. And the Second Circuit and Iridium and the Third Circuit here recognized that and said this is the rare case where that's true. But I think the question is why this is a rare case. Every structured settlement of this kind is trying to exclude one set of creditors. And this is exactly what this did, and it did it in collusion among the senior creditors and junior creditors to the exclusion of the disfavored creditor. If, in fact, you were to concede, start saying, well, this is the person who's wearing the white hat, this is the person who's wearing the black hat. I'm not, I'm not, I'm just trying to figure out what creates the exception. The narrow legal issue before this Court is simply looking at the code, does the absolute priority rule as such apply outside the context of plans? Breyer, you were beginning your first statement, if you remember. You were just about to give us a special reason, which I wanted to hear. Oh, well, these Petitioners received a substantial distribution of assets on the first day of the bankruptcy, as to pay for their pre-filing, their pre-petition wage and benefits claims. They got millions of dollars, in fact, far more than the settlement.  It's no accident that they got millions of dollars. My problem is quite simple. This is not your asset. That's correct. This is an asset of the estate. That's correct, Your Honor. All right. So there is an asset of the estate. Right. It's a claim against a third party. Yes. Very well. Right. And now there is a person, probably the trustee or a committee, that's going to pursue that claim. Correct. Then the claim is settled. Correct. Now, at least on request, when you're in Chapter 11, doesn't the judge, the bankruptcy judge, have to approve that settlement? Not the settlement per se. No. Why not? Because there's no provision in the code. This is what we explained in our brief, that specifically, post-1978, there used to be, in the pre-1978 world, there was a provision that required a review of settlements qua settlements. Post-1978, there is a provision, 363b, that requires a judicial review of use, sale, or lease of assets. In this case, they intersect, because this settlement actually not only brought money into the estate, but actually then settled it. But suppose they settled it for a dollar, and one of the creditors says this is all corrupt. I'm not saying it is in this case, but I mean, wouldn't there's an asset of the estate, they bring a lawsuit, they reach a settlement, and suppose it's a totally crooked settlement? What happens? Again, this is a code case, Your Honor, and there's not. I'm not talking about this case. I just want to get background in my mind. Right. I think that that's. So there's no power of the bankruptcy judge to even look at a settlement that the company in bankruptcy has made of an asset, namely the claim that he has against another party. There is no provision governing settlements qua settlements. What there is a provision, and I want to make this very clear, Your Honor, because I'm not sure this was as clear in our brief as it should have been, and I apologize if it wasn't. The fact that there's no provision for approving settlements qua settlements doesn't mean, which there had been under the old regime, doesn't mean that when you have a settlement that actually disposes of estate assets like this settlement did, that that disposition of estate assets is not subject to the traditional rule 363B review by the Court of any use, sale, or lease. Breyer, then we're the same. I just wanted to make it clear that. Breyer, once we're in that place, what we have is a settlement not corrupt, not crooked, perfectly fine and honest and so forth, but what it does is it takes Congress's 5, 4, 3, 2, 1, 2, 3, 4, 5, and it says what we'd like to do is 5, 4, 3, 2, 1. Correct. Now, what that seems to do is it seems to be quite contrary to the order of battle or the order of distribution that Congress has said should apply to the assets of the estate of which this is one. And you are absolutely right, and as the Second Circuit said in Iridium and as the Third Circuit said in this case, that is the most important concern in the 363B discretionary analysis to make sure that there is no evasion of that scheme. Well, say, now, you provide a case, Congress has said, 1, 2, 3, 4, 5, for estate assets. Right. You have an estate asset and you want to do, I exaggerate, 5, 4, 3, 2, 1. Right. So where does the bankruptcy trustee or any court get the power to say that a group of people can, in fact, reverse the order in which these assets will be distributed? That is what is bothering me and presumably the government and certainly the workers here who are upset about it. Well, Your Honor, and I think the clear answer to that is, as a general rule, they can't. But this case explains exactly why Iridium said there may be some rare exceptions. Once you are in this more discretionary 363B land, the priority scheme is going to be the most important. This case is a great example, Your Honor, because in this case we have findings that there could be no confirmable Chapter 11 plan because the estate was administratively insolvent. So the code system that you just described, the waterfall of priorities, would not apply in Chapter 11 because there was no way to go to a Chapter 11 plan. But I'm sure it often happens that there can be no confirmable plan because the creditors the priority creditors are not going to concede. So that happens all the time. You go through Chapter 7. Wait. And then. So that's not a rare so this is not a rare case. But this is only the first prong, Your Honor. Then the court also analyzed, well, the alternative then is conversion to Chapter 7. And we have findings there, too, that in a conversion to a Chapter 7 liquidation, in fact, the estate asset, there would be no settlement there because at that point once you've gone through the expense and delay of converting to Chapter 7, it wouldn't make sense to settle. There's many reasons that you might want to be willing to settle at the beginning of a case. Kennedy, but it seems the essence of the case is not really an objection to approval of the settlement, it's the objection to the distribution of the assets. And that's what I think that's so critical, Your Honor, and their objection would actually completely come back to bite them because there is no legal difference between a distribution of assets on the first day where they recovered $6 million in this case in their prepetition wage and benefit claims. That's why, to go back to Justice Alito's question earlier, it was not a slip of the pen that led them to change their question presented from the question from the petition to the merits brief. They know perfectly well that a rule that the absolute priority rule applies to every distribution of assets would have creamed the workers in this case and would in future cases, because such workers are often the beneficiaries of these first-day orders that pay priority or that pay wage and benefit claims, that pay critical vendor orders. Once you're talking about a world, as they seem to be suggesting, that all preplanned distributions of assets are subject to the absolute priority rule, that's not the case, that's not in the code, that's the crux of the dispute here. That was a circuit split that this Court granted cert to resolve. Robertson, I thought they had a priority at the initial stage that required them to be paid the $6 million that you're talking about. They were not the – they were people above them in the chain. They were administrative creditors, they were secure creditors. They did not have the top priority at that point, and that was not subject to the priority system. Ginsburg What they are saying is that under the priorities, that belonged to us, not creditors who were lower down. Correct. And I think that there was a finding here that, in fact, the alternative to this settlement was not a settlement where they actually would have – it was not a Chapter 11 plan, because they would have recovered nothing in a Chapter 11 plan, because there could have been no Chapter 11 plan. It was not confirmable. And in conversion to Chapter 7, they wouldn't have gotten anything either, because all the money would have gone to the secure creditors. Breyer I see that point, which you've made several times. It's a very good point. I clarify a basic misunderstanding on my part. What's a structured settlement? Well, I think a structured settlement is – it's not a legal term. It's something they've come up with in this case. I think – Breyer Why not just call it a settlement? I think you could. And I think that – and that could – and I think – Breyer Okay. Let's call it a settlement. Perfect. So now, a company finds, very surprisingly, that there, underneath the building, is John Lafitte's gold treasure. But there is somebody down there who has it. He says, give it to me. It's ours. He says, I'll give it to you, but I want you to use it to pay my friend, who happens to be my cousin, who's the 19th-ranked creditor. And as long as you give the majority to him, okay, then you can give the rest to the others. All right. Now, that would seem to be a possibility, at least, from your argument in this case. Your Honor, I think what you are saying – the point that you are getting to can be resolved through the traditional 363B analysis, which allows for play in the joints, unlike their unyielding and absolute – absolute priority rule. Under your hypothetical, Your Honor, there would be money there. And in that case, it looks like that would be an evasion of a – there could be a plan there. By the way, if you want me to, I will make up my hypothetical so that giving half the gold to this person is just as wonderful as you would like. And I will also change the hypothetical around, as you could do or I could do, so that not giving the money to this person would be just terrible. Right. The earth will come to an end. So the question is, do you think Congress gave to the trustee or to you or to somebody else the power to deviate with Jean Lafitte's gold or with these particular – this particular set of money or any other set of money? It seems to me a dangerous principle to get into, but if you can tell me where that normally happens, I'm open to it. Well, it doesn't normally happen. I think that is the lesson of Iridium and this case. The Third Circuit said, as a general matter, if the creditors were to come together and say, you know, we really just don't like this one creditor, even though that person has a high priority, we're going to structure this so that that person gets disfavored. Well, under the 363B analysis, if that person would actually have had an alternative where they would have recovered something, that would be a problem. Well, let me ask you a – Mr. Leonard, it's sort of a similar question. Here's two different kinds of bankruptcy schemes. One scheme just says every time you distribute assets, you have to follow the following order, 1, 2, 3, 4, 5. That's – and that's it. You just have to follow that order. Correct. That's one bankruptcy code. Here's another bankruptcy code. It says, presumptively, you have to follow 1, 2, 3, 4, 5. But if there's a Pareto superior solution, in other words, a solution in which some people are made off and nobody – in which some people get better outcomes and nobody gets a worse outcome, if there's such a solution, you can go with that. And that might be a completely sensible bankruptcy provision for Congress to have enacted. The question is whether Congress did enact it and what you can point to in the bankruptcy code that suggests that the continual statement that it's just 1, 2, 3, 4, 5 is subject to a kind of equitable exception for Pareto superior outcomes. Yes. I can – I can exactly answer that question. The line that Congress drew in the code is the absolute priority rule with its – you know, with the specific 1, 2, 3, 4, 5 that apply as a matter of law and is unyielding applies to plans. When you are not in the world of plans, you are in the world of 363B, which has play in the joints. And so the Pareto optimality that you just said, Your Honor, is something that is appropriate in a 363B analysis. Now, as the Second Circuit pointed out in Iridium and the Third Circuit pointed out here, a critical consideration in that discretionary analysis is to make sure it is not being done for the purpose of evading what would otherwise be something that could proceed to the stage where Congress made the absolute priority rule applicable. But I don't understand how you get to an extraordinary circumstance in that – in this situation. It seems to me that wanting to exclude the claims of one or more creditors is the ordinary situation. Every junior creditor wants money. They're happy to exclude anybody they can. Right. Or anybody who will concede to doing it. Right. So how do you protect the excluded creditor from being preyed on by one of the other creditors? We already know the junior creditors have a self-interest. Absolutely, Your Honor. The senior creditors have. It happens to be that one of the biggest senior creditors here is the one who was insisting upon excluding the junior creditor. Yes. So where do we go? How do we define extraordinary? In that 363B world, Your Honor, that governs the use, sale, or lease of assets, when a court looks at that, a court can say, is the creditor who's claiming that he or she or it is being unfairly squeezed out, in your hypothetical, can show that there is some mechanism under which that person would otherwise, absent the settlement or the disposition of assets that is contemplated at issue before the court, would actually make off better? The critical problem here is that there were findings. There was a hearing in the bankruptcy court on this. It went up to the district court on review and then to the Third Circuit. And there were findings. The findings were, and these are critical, that there could have been no proceeding to a Chapter 11 confirmation. So the idea that this would have proceeded to a place where the person squeezed out in your hypothetical would have actually recovered something in Chapter 11 is counterfactual. Kagan. Kagan. I mean, you might be right or you might be wrong about that. Let's just assume that you are right, that this is one of these extraordinary circumstances in which some people can be made better off and nobody will be made worse off. Still, the question is, where is the authorization for that in the bankruptcy code? Because that's like a big principle. I mean, and I think we would have known about it if that's the way bankruptcy proceedings were supposed to go. And you suggest, well, it's in this four-cause language. But this four-cause language, I mean, this is a pretty specific provision that we're talking about. What it says is that when you can't reach a plan and the case has to be dismissed, this is attached to a provision that says everything has to be rolled back. And this says, well, not, you know, maybe if there's a good reason, not everything has to be rolled back to exactly the way it was. But that's a really different kind of provision than saying, and courts, you get to decide, or parties, really, you get to decide, and then courts get to order. And I think that's a very different kind of provision than saying, well, you know, I'm going to approve an outcome of a bankruptcy proceeding that does not follow the usual priority rules just because these particular parties, not all of them, but these particular parties, think it will make some people better off without making other people's works off. Your Honor, the key point is 363b. That is the general provision that requires bankruptcy courts to review the use, sale, or lease of assets. When you have the — what they are objecting to here in this settlement is the fact not only that it brings money in, but that it actually then distributes money to different people in a way that they say doesn't comply with the absolute priority rule. So it's the 363b discretion. That is a standard about best interests of the estate. It's been phrased various ways. That's really a judicial gloss in the language of the statute. And that's probably, you know, the absolute contours of 363b are not really within the question presented here. The question presented here really is, are we in a world where there is any discretion at all versus a world where the absolute priority rule applies by its terms? Breyer, if it's 363b, is there — I mean, this — you're just saying they did it the wrong way. When they reached the settlement, then this — the Petitioners here should have gone to the bankruptcy judge and said, Judge, you know, there's an odd thing about this settlement. They're not only paying in $3 million or whatever, but they want to tell you how to distribute it. And they want to tell you how to distribute it, and we want you to distribute it according to the rules and not according to what they say. That's what you say they should have done. That's what they did do. And in fact, there was a — Well, if that's what they did do, what's the problem? No, but — You're saying they have discretion there. Yes. So the question is, do they have discretion to depart from — Yes. Okay, I got it. Do they have discretion to depart from the — do they have discretion to depart from the priorities as set by Congress? Exactly. What I'm saying is that, you know — Over the objection of one of the creditors. The basic dispute before this Court in this case is, does the absolute priority rule apply to distributions of plan assets — of estate assets, excuse me, before a plan? They say, yes, it does. We say, no, it doesn't. Use — distribution of estate assets, whether it's on the first day through a first day order, a critical vendor order, is all subject to — Well, once — then I'm back with Justice Kagan. I'm pretty worried about that principle. But the reason I'm worried about it is — and you'll be worried about it. All you have to do is represent some client or represent some — a bank, for example, that thinks it has secured — thinks it has a secured interest in something. And lo and behold, there's a $40 billion settlement, and they make it conditional. Let the money go to the widows and orphans, okay? So we reverse it here. But, Your Honor, just to be clear, discretion doesn't mean whim. And I think the Second Circuit in Iridium and the Third Circuit in this case were very, very clear that the most important consideration for a court to look at in assessing a distribution of assets that doesn't comport with the priority rule is, is there a compelling reason why it doesn't? Well, that's, I think, where the issue comes down. I mean, the reasonableness of your position is directly related to how extraordinary the extraordinary circumstances have to be. I mean, you're — you're suggesting that the main criteria in approving under 363B is pretty much what the priorities are under — under Chapter 11. Right. Well, if there is a very close requirement there, then, you know, what you're asking for is not that extraordinary. It is, Your Honor. That's why this — If, however — well, if, however, that it's — that priority simply informs the exercise of discretion by the judge under 363B and is not as tight a requirement, well, then it's — you know, then it is pretty extraordinary. And — and it makes a difference. Under the — the Chapter 11 regime, people's leverage in negotiating the plan depends to some extent on their priorities. Under the — the settlement regime, it's not — you know, the leverage is reshuffled, and it's more or less who can gang up on who but who else. But Congress drew a line. I'm sorry. Could you answer my question? Congress drew a line that the absolute priority rule as such applies to plans. When you're talking about distributions of assets other than plans, you're in that discretionary regime. The question presented to this Court by the petition is the split between a WECO on the one hand and a RITM on the other, which is, is it — is it the absolute priority rule that governs pre-plan distributions, or is it this discretionary regime? One can, in other cases, work on the — and so you can resolve this case by simply saying they're wrong to say the absolute priority rule applies outside the context of plans. The extent to which you get into the exercise of discretion is something that they didn't present in the question presented. They didn't say the Third Circuit erred in applying the discretionary Iridium standard. Roberts. If we're concerned about how extraordinary the extraordinary circumstances are, in other words, your position looks more reasonable, the tighter the extraordinariness requirement is, what type of language would you require? I mean, you're saying, oh, we'll just say you can do this, and then it will work out over time how extraordinary it is. But what would you say if you felt an obligation to tighten the extraordinary requirement? I don't think I could improve on the language that the Second Circuit used in Iridium and the Third Circuit used here, saying that it is the most important consideration is conformity with the absolute priority rule, so that if there is a confirmable plan that is the one where the person complaining that they were cut out would actually get something in the absolute priority, through the application of the absolute priority rule, that would be almost implausible to think that it could ever be approved. The fundamental problems of this is what Ms. Harrington ended her remarks by saying is that you're just saying the plans that the bankruptcy code declare not confirmable are, in fact, going to be confirmed through this alternative procedure. No, Your Honor. Again, now we're talking about the means for terminating Chapter 11 plans, which is a little bit different than the question presented, which is all about the distribution of assets. But just to be clear, so Section 1112 of the code says that if a Chapter 11 plan can't be confirmed, you have two alternatives. You either go to Chapter 7 conversion or to dismissal. There are specific findings here that Chapter 7 conversion made no sense because the trustee, the estate did not have the money to pursue the claim on its own, and nobody would bring this case on a contingency basis. The Petitioners here were participating at that hearing in the Bankruptcy Court where this was done. They didn't raise their hands and say, hey, we'd be willing to pursue this on a contingency basis, which is why it's somewhat far-fetched to say the least that they're now suggesting that theoretically, while they were deprived of this opportunity to pursue this claim outside of bankruptcy, they were given the opportunity to pursue the claim on behalf of the estate in bankruptcy, and nobody wanted to do that. Sotomayor, is there a difference in your mind, because there might be in mine, between a settlement that settles an individual claim, the emergency creditor claim that your opponent spoke about, where there is not a total distribution of the assets of the claimant, and a plan that's really just an alternative plan, because that's what this structured settlement was? In my mind, something that would be an extraordinary circumstance would be something that did something like the first thing and not necessarily the second. I think Your Honor is making a very important point, which is the application of the 363B discretion may well vary depending on the circumstances of the case and just your first hypothetical. That is now we're talking about the way that that 363B analysis applies, and it may apply differently on the first day of the bankruptcy versus the last day of the bankruptcy. Sotomayor, so would you tell me why Sun Life Care, if it got its settlement, i.e., it was going to pay $2 million and get all the claims against it released, what was its reason for not wanting the proceeds to be distributed according to the absolute priority rule? It wanted a global settlement of all claims. They got that with all other creditors. The creditors, the Petitioners here, refused to settle their warrant claims, and those are their claims outside the context of this claim being settled, for less than $0.10 on the dollar. So they were holdouts, essentially, refusing to join the global settlement  Sotomayor, I'm sorry. Does this mean that the junior creditors wouldn't have agreed to this settlement because the senior creditors could have? What did the senior creditors who were in line care about, how much was left over to junior creditors, including Sun Life? Well, I think that the point is that Sun would not have entered into the settlement at all unless — which benefited all the creditors, including the junior creditors. But why? Why does it care? Why does Sun? Why does Sun Life care? In the absence of a global settlement of this warrant claim outside of the — against Sun, Sun didn't want to have a settlement that funded the litigation against it. Now, the settlement would have been the one that occurred. No, because there's two different claims. The claim that was settled was the estate's fraudulent conveyance claim. These particular Petitioners had a separate warrant claim against Sun and the debtor. And it was in the context of settling the fraudulent conveyance claim against the estate, Sun only wanted to have a global settlement to put this whole litigation behind it. And it said, we're not going to settle the fraudulent conveyance claim in a way that funds the Petitioners. Sotomayor, do you think they can still sue you for those fraudulent conveyance claims? Not for the fraudulent. Not you, Sun Life. They can certainly sue the — they could certainly pursue the warrant claims. And they did. That was their choice, not to participate in the settlement. The fraudulent transfer claim? No. The fraudulent transfer claim was ended. But I think the key point, there are findings here that the fraudulent transfer claim was essentially worthless to them because there was no money to pursue it. You don't understand my basic question. Okay. What did Sun Life care? If the fraudulent conveyance claim was going to be resolved and released, to why did it care to exclude these truck drivers from receiving whatever they demanded? Because that would have funded the truck drivers to pursue their separate warrant claims against us. So we didn't want to do that. But that eventually, you had already — Sun Life had already won that. No. We only won later. It's the timing of that, I think, Your Honor, that really gets the point. I think the fundamental point here is we're really talking about a rule where they're saying the absolute priority rule inflexibly and invariably applies even before a plan. Our position, on the other hand, is that the used sailor assets at any point before the plan is governed by 363B. There are — that's a discretionary regime, and as the Second Circuit said in Iridium and the Third Circuit said here, it is absolutely critical to look at making sure that it's not an evasion of the plan. But the question that this Court was asked to resolve is, is it the rigid and unyielding absolute priority rule or the 363B? And the code answers this question. And so I think in this case, that the — Breyer. The code in the 363B says is the trustee can sell the suit. Okay? That's what it says. It says nothing about — it says nothing about what the terms are. It says nothing about what the settlement is. And the question for us, I guess, is in those words which make no reference to it. Can you settle it on terms that will, in fact, take these assets that belong to the company and distribute them in a way that is contrary to 1, 2, 3, 4, 5? Right. But the distribution is a use of the estate assets, Your Honor. So again, it goes to can you — what are the constraints on using the estate assets? And I really encourage you, again, to look at the very tight way in which the Second Circuit overstated it by saying you can never do it. In other words, the Fifth Circuit has an absolute bright-line rule, we don't care how Pareto-optimal this is. And I think the basic point was made by the Bankruptcy Court here, the Bankruptcy Code is not a suicide pact. So if, in fact, you have a situation where the settlement and the distribution proposed makes others better without making these folks worse off, there's nothing in the code that prohibits that. Roberts Thank you, counsel. Two minutes. Two minutes, Ms. Spinelli. Spinelli Respondent's position fails because Section 363B is not a means of distributing estate assets. The 363B discretion that Mr. Landau referred to is discretion to approve a settlement or a sale of an estate asset, not to distribute the settlement or sale proceeds in violation of priority. Assets are distributed under Chapter 11 through a Chapter 11 plan. That's it. And our fundamental point here is that those assets cannot be distributed on account of prepetition claims in violation of priority. To the extent there's a potential exception for the doctrine of necessity, that's hotly disputed. Courts disagree about whether that exception exists. And that's not an issue this Court needs to resolve, because the doctrine of necessity by its nature is designed for situations in which a payment to prepetition creditors is necessary to the reorganization of the debtor. There's no dispute that that wasn't the case here. And as for our first day order paying the wages of the drivers, that was consented to, and no one is saying that you're not allowed to consent to a priority violation. The only point we're making about structured dismissals is that there is no superpower associated with structured dismissals that provides for an exception to that general rule that one cannot distribute estate property on account of prepetition claims in violation of priority. Respondents' rule would wreak havoc on the basic process of bankruptcy. If debtors could distribute estate property to creditors at any time without regard to the priority scheme before a plan, there wouldn't be much left of the scheme. Debtors could simply reach a deal with junior creditors and distribute property, leaving inadequate resources to pay senior creditors. Roberts. Thank you, counsel. The case is submitted.